The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Robert J. Stigman presiding. Thank you. This is our case number 418-0158. People v. Denise Woodring. I ask counsel for the appellant. Please state your name for the record. My name is Drew Wallenstein. I represent the appellant, Denise Woodring. Drew Wallerstein? Wallenstein. Wallenstein. Thank you, sir. And it's Ms. Shepard for the state who is appearing for the appellee. We've already heard from her. So, Mr. Wallenstein, I'll let you proceed at this time on behalf of the defendant appellant. Thank you, Your Honor. Again, my name is Drew Wallenstein. I represent Mrs. Woodring. This afternoon, I'm going to focus on two issues, namely issues 1 and 2. But I'm fully prepared to answer any questions about issue 3 should the court have them. Okay. Before I talk about each issue in turn, I want to speak more broadly about what happened at trial. The actions of the court and counsel limited Denise's ability to present a defense to the point where she was not able to properly defend herself. The state's evidence primarily relied on inferences from the fact that she took certain drugs certain times to the fact that she was incapable of driving. There really wasn't any direct evidence that those drugs' effect on her would push her to the point where she was incapable of driving. They really relied on the treating physician's testimony from the testimony of the Illinois State Police witness to establish that, okay, these drugs could have the effect of making her incapable. But there wasn't really evidence that she was incapable based on her experience with those drugs, based on her actions caused by those drugs. Thus, the court and counsel's actions in this case really restrained her from presenting a defense because she did not have any expert testimony in her case to establish that there was an alternate explanation for why she would be incapable. For instance, drowsiness or some other source of incapacity that would have prevented her from driving. Now, that being said, let me turn to issue 1, which is that she was not allowed to present a complete defense because she was not allowed to present expert testimony from Dr. Robert Henson. On this issue, I think the court erred in two important ways. The first is that Henson had the expertise to testify about impaired driving. He had decades of experience in that area. He was a nationally recognized person. He had testified numerous times. He had given numerous speeches at different conferences. He had testified in over 150 jurisdictions. And that was something that was a valid area of expertise that would have aided the trier of fact in this case because he could have provided testimony about impairment, how it would have impacted the case and the evidence in the case. The second way the court erred was that the basis of the court's ruling was factually wrong, that Henson did not have a background to testify on matters concerning toxicology and pharmacology, which the court functionally said would eliminate his ability to testify in this case. That's wrong for two reasons. The first is that he had, well, first I'll point out that he had testified to toxicology and pharmacology before in a number of jurisdictions. That could be seen as important. I'm sorry, could you repeat the question? Yes, why is that important or a significant factor, if any factor, for the trial court in this case to consider whether the proposed expert witnesses testified as an expert witness somewhere else in some other context? Well, I don't think it's conclusive that okay, he testified in another jurisdiction, therefore he has to be allowed to testify in this jurisdiction. I just think that's the first thing you argued and I'm wondering why is it important at all? Well, I'm just pointing out that he has been made an expert numerous other times. It's something that goes that the court can weigh and consider when judging his CV and the breadth of his experience. I think what I started with is that he has decades of experience in this area. He runs a drug lab. He has a background in education which dealt with sciences. He has given numerous conference speeches about the subjects of toxicology, pharmacology, impacts of drug and alcohol on driving. He has advised police departments, advised institutions, advised legislatures. He has a deep breadth of experience covering the impacts of drugs and alcohol on driving. And from that sense, the court was wrong. Mr. Wallenstein, was there an offer of proof as to specifically what the expert would have testified to? Yes, an offer of proof was made in the defense's answers to discovery where he laid out what he anticipated Dr. Henson to testify to. And it was made in the motion for new trial where he specified here's what Dr. Henson would have said throughout the course of trial had he been allowed to testify. I'm referring to an offer of proof where the witness is put on the stand during the trial outside the presence of the jury, which of course this was a bench trial so that's not so much an issue, but where the specific testimony is elicited in front of the court at that time. No, defense counsel did not make an offer of proof in that sense. Defense counsel did not call Henson and say, okay, I'm going to put him on as a witness. And then my next question is, and what is the specific testimony that the expert would have offered that you believe would have allowed your client to present her case? Well, it's demonstrated in those answers to defense in the motion for new trial. Would you tell me specifically? Dr. Henson would have been able to testify that there was another alternative reason that she was impaired at the time, namely drowsiness and that drowsiness would have impaired her and that it was an alternate cause than the drugs being the form of impairment based on his experience. And so as to drowsiness, is that something which your lay person needs expert testimony to determine whether or not that applies? Well, I don't think they need expert testimony to say whether somebody is tired or not. They do think they need expert testimony in a case like this where we have different drugs impacting her at different times and the timing of when she's driving versus taking these drugs and how tired she is and all of that. I don't think necessarily a lay person can completely balance and understand what is the exact cause that could make somebody incapable of driving at this specific time. So I think he can provide testimony that based on his experience and knowledge of how drugs and alcohol affects somebody driving, he could say it's not necessarily to conclude from this evidence that drugs is the sole cause of her being incapable of driving causing the accident. And so is it your position that he didn't have expertise in terms of the impact of the drugs on her, but he had expertise as to an alternate reason for her conduct? Well, I think he had expertise in both areas. What was his expertise with respect to the drugs? Well, I think his expertise with respect to the drugs is his decades of experience working with drug and alcohol impact and threat. That's a specific area of study and focus. Well, I mean, when we talk about pharmacology, aren't we talking about what the makeup of a drug is, the impact it has on a body, and don't you need something more than I've investigated cases or I'm aware of and dealt with cases where people were driving under the influence of alcohol and drugs? I mean, are you suggesting that that's enough without any in-depth training, education on actually the makeup of drugs and how they impact the body? Well, I think he has expertise, in-depth expertise. He has specific expertise looking at the quantity of alcohol and drugs and advising police departments, legislators, other groups about what is the impact of these drugs on driving and what are the different scenarios that would impact them? Now, I don't think he needs medical testimony or medical experience to be able to testify to, in his decades of experience in this very specific field, looking at what are the impacts of drugs and alcohol on driving to testify to what was the impact of somebody taking drugs on that specific day? I think his specific experience goes well beyond just, you know, goes beyond the analogous scenario of a police officer just saying, well, based on my, you know, decades of working as a cop, you know, this would have made her have a DUI. He has much more experience than that. He has significant experience dealing with the physical manifestations of drugs and alcohol, their impact on driving. As I said, advising large institutions, how do you create policy? He ran a drug testing lab. So he has well beyond just minimal experience. He has significant experience in the area of drug and alcohol and testing and the impact of drugs and alcohol on the body. Well, for example, with respect to the lab, my understanding is that he participated in collection of samples, not in analyzing samples. Is that incorrect? Well, I think it's incorrect in the sense, well, I think what you're describing is like his day-to-day is correct. He deals with the collection, but he is also running the lab from my understanding. So he would be the person supervising the work of the entire institution. It'd be like, I think the analogy would be like, if you call the supervisor, one of the ISPs testing. Yeah, they not, maybe they're not the one doing the serology test or doing the DNA test. But if they have decades of experience working in that area, overseeing other people, establishing the policy. If you're running a lab, you need to obviously know what is correct and what is incorrect about the operations of the lab. What was his experience or training in administering the necessary test that would answer the question of, you know, what was in this person's body? What impact? I mean, I didn't see that he had that type of training, like as a scientist, like the people who worked at the state police lab, as you mentioned. Well, I think he gained that, I think he gained that experience working in consulting and lab works. Like he had previous experience working for Barron Consulting and Lab Works, which is a company that dealt with different kinds of testing and all that. And he did that since 2002. Prior to that, I just think he gained general. Well, firstly, he gained his PhD, specifically in this kind of area, dealing with applied management and decision science. And so he had focused on workplace substance testing at that point. And from there, he branched off into more and more knowledge about substance testing for drugs and alcohol. He continued to get in-depth experience year after year. As I said, this very specific level of expertise. Well, Counselor, let me ask this question. Is my understanding correct that when the state conducted its Warder Examination of Henson, regarding his training and experience related to pharmacology and toxicology, he testified that his college courses pertaining to those topics were, quote, he can't remember what type of courses they were specifically or whether, quote, they were biology, science, or sociology classes. Is that his testimony? Yeah, I believe that's accurate. Well, now, if I'm the trial judge and I hear that that's the limit of his training with regard to toxicology, his coursework in pharmacology, it's a bit troubling, especially when he can't remember what type of courses they were and mentions the possibility of sociology classes as being the context in which he studied about this. Why is that incorrect? Well, I don't think his undergraduate coursework is the limit of his expertise or training in this area. I think, as I've laid out, I mean, he went on to get a PhD in the area. He then did decades of work in this very specific field, dealing with drugs and alcohol, the impact of driving, testing, how police departments should deal with drug and alcohol-related driving incidents. As Justice Warner-White points out, how police departments test people and how they perform or their protocols for doing so hardly addresses the results and getting the results and what the results mean, which is a specialty of toxicology and pharmacology, isn't it? Yeah, as I said, you know, he then got more scientific experience and he's run a drug lab. What specifically is the experience his record showed that he had with regard to the subjects of toxicology and pharmacology, which is what the trial court repeatedly addressed? Well, I'll say two things to that. First, my first point was that I don't think toxicology and pharmacology is the gateway for him to testify in this case. Second thing, as I said, you know, since 2002, he had actually ran a drug lab testing for alcohol and drugs. He had ran, oversaw it, that would give somebody, you know, he's the president and principal consultant on a lab that actually tests for alcohol and drugs. You know, I don't need to tell your honors, but alcohol and drug testing labs have strict rules. They have rules, procedures that need to be followed. Somebody overseeing them would need to enforce and deal with those rules and understand them. He may not be the one that actually takes the hair, you know, places the hair and draws something from the pipettes, but he is the one overseeing the running of the operations of the lab, which would give him significant experience in talking about those areas. Counsel, so let me ask it this way. Maybe I take an overly simplistic view of this, but when we talk about certifying an expert, we talk about training, education, and experience. And you seem to be really putting all your eggs in the experience basket. Do you want to speak to training and education? I think, I don't want to speak for my colleagues, but I think that's what they're asking you about. Yeah, well, I would say his experience goes to several different areas. The first is that, as I said before, he has a Ph.D. in applied management and decision sciences, which focuses on substance abuse testing. It was a Ph.D. that, yes, it's not a science Ph.D., but it's a Ph.D. that focuses on the testing of drugs and alcohol and the factors that go in to making decisions based on those areas. I appreciate the effort, but for me, it goes beyond training. I mean, basically, your argument, in my view, consists of, if I manage, if I run a doctor's office, then now I'm an expert on what the doctor is doing, which makes no sense. Well, I think it's a little bit different in this case because he's not just like an office administrator. He's actually the person dealing with the more level decisions. Like, he is the president and principal consultant on the left, which I think goes beyond just like, you know, the person who decides specific things about a doctor. That may be, counsel, but that may be, but that's for you to illustrate how that experience goes beyond that and how, in doing that work, we found something above and beyond the average general knowledge. Right. I mean, I would say that if you look over all of his different experiences working for different institutions and working for different governments, he has spent decades instructing on different alcohol and drug testing, the enforcement of DUIs, the screening and the impact, you know, the physiological and pharmacological effects on the body. He's done that for the Police Training Institute, for Millicent University, for Iowa Wesley. He has spent years focusing on the impact of drugs and alcohol on the body, on driving, on how different institutions should evaluate and deal with and test how those drugs and alcohol can manifest. Sorry, I'm just taking one second. From that sense, I think that he does have, he has the training, the experience, the expertise, and while he doesn't have a traditional science education, his education includes areas that impact and are relevant to his expertise. Counsel, I want to ask you about witness, Dr. Saeed, if that name is pronounced correctly before your time runs out. My question concerns the record. You're arguing that the trial court, combination of the trial court and counsel kept him from testifying in this strange, if not bizarre, exchange that occurred when he was on the witness stand. But the difficulty in arguing constitutes a basis for reversal at this point is twofold. One, do we know what Dr. Saeed would have testified to if he had been permitted to testify as an expert? And two, do we know and how do we evaluate what that would have been? And actually a third one is, we're kind of assuming he might have been able to be established as an expert, we don't really know. On this record, how can we make a determination in the absence of an offer of proof as to what his testimony would have been to reverse at this point, as opposed to saying, go and file a PC where perhaps all of these matters could be addressed and answered and we would not have to be engaged in guesswork? Well, I think he laid out what he expected Dr. Saeed to testify to in the defense's answer to discovery, where he specified that Dr. Saeed was going to come in and testify. Counsel, discovery, and you've now referred to discovery in post-trial motions, those aren't offers of proof. I think he's laying out on the record what he would have testified to. Well, an offer of proof is a specific matter addressed to the trial court, either make a formal offer of proof or an informal offer of proof in which trial court is able to be given to understand what this testimony would be. We don't have anything that amounts to an offer of proof in this case. Well, I think for this court to evaluate the issue, though, it just needs to be in the record that you can evaluate what Dr. Saeed would have testified to. And I think the defense's answer to discovery do lay that out. Well, the discovery may suggest what it is, but discovery isn't the same thing as making representations to the court, which the court could decide I'll accept, or saying, no, I want to actually hear from the witness himself. In which case, the court would then have the opportunity to hear what the witness says, and we would have a record. So we wouldn't be guessing as to what the witness would say. I would agree with you, Your Honor, that absolutely that would have been the best practice. But I don't think this court is limited from ruling on the issue, because I do think that what he would have testified to is shown enough in the record based on what's there. I would also say that any failing to make that offer of proof or to get that in there would obviously fall on counsel. Counsel clearly didn't want to make Saeed a witness because he didn't want to pay for him, didn't want to try to get funding for him, and kind of just folded like a wobbly house of cards once he couldn't get the opinion testimony yet. Well, you're right that it might very well be a failure of counsel, but still, before we can conclude that it would amount to ineffective assistance, we have to be able to make a determination as to, one, whether a foundation for expertise would have been established, and secondly, was there prejudice based upon what he might have testified to have permitted. Just quickly, because I've run out of time. It's okay, counsel. I want you to, you know, we asked you a lot of questions earlier, but I want to hear your response about Dr. Saeed, so go ahead and respond. Okay. As I said, I still think that the record is complete based on for this appellate review. What I think counsel should be faulted for is when he was not able to present this testimony, he definitely should have been making more thorough records of what was happening. Now, just because it's not as thorough as it should be does not mean that this court cannot evaluate the issue. I think that there is enough in this record for the court to make the evaluation. Okay, thank you, counsel. You will have the opportunity to address this again in rebuttal. Thank you. Ms. Shepard, we can hear you and can't see you, unfortunately, but you may proceed now on behalf of the appellate. Thank you, Justice Steigman. May it please the court and counsel. I would concur in many of the things that, well, pretty much everything that your honors have been stating so far about the defendant's arguments. I would also point out as to Henson's background with his lab and the testimony was that in his lab he collected and screened specimens, which he then sent elsewhere to be tested. So, but regardless of whatever his experience was with the lab, you know, the issue here, of course, that the trial court had to decide and did decide in favor of the state was that the defendant drove while under the influence of drugs, which rendered her incapable of safely driving. And that was a proximate cause of the victim's death, not the proximate cause. And nothing in the record shows that Henson or Dr. Saeed could provide any testimony which would support a conclusion that defendant was rendered incapable of safely driving, not by drugs, but solely due to some other cause. Nothing in the record shows that either could testify that defendants driving under the influence of drugs to a degree that rendered her incapable of safely driving was not a proximate cause of the victim's death. So, as the record shows, as the trial court found in lengthy and detailed findings, there was overwhelming evidence that defendant drove under the influence of drugs, which rendered her incapable of safely driving, and that was approximate cause of the victim's death. The evidence showed she drove while she was sleepy, tired, and drowsy. There was no expert testimony that was needed to testify to that or to establish that. And I would point out also that Henson never met defendant, did not examine her. It's unclear, as your honors have been discussing, what exactly he would have testified to. Clearly, his experience and education as to pharmacology and toxicology was limited to this lab that he ran only to collect and screen specimens, and also some course that he couldn't quite remember the specifics about way back when that supposedly, or that he testified, did deal with pharmacology. So, where does that get him in terms of what could be relevant or helpful to the trial court in this case? The state's witnesses testified that many of the many drugs that were found in defendant's bloodstream and urine could cause drowsiness, and that three of them could also impair her judgment, coordination, and memory. The trial court could reasonably infer that the levels of those drugs was higher at the time of the collision, that their effects were enhanced by the cocaine metabolite, which was also found in her blood and urine, and which further affected her reaction time. There were witnesses that witnessed her driving before the collision who testified that before the collision, she was driving erratically, swerving off the road at a high rate of speed. She pulled over, but then she got back on the road, indicating impaired judgment, which also was a side effect of the drugs in her system. And when defendant veered off the road, she was unable to make a minor correction to return to her lane and instead drove into the oncoming lane of traffic. So, the record contains nothing which would indicate that any witness could testify that defendant was rendered incapable of safely driving by drowsiness or sleepiness alone, to the exclusion of the effects of the drugs in her system, many of which themselves could cause not only drowsiness, but also impaired judgment, coordination, and memory. So, she can't show that the trial court abused its discretion. Of course, it's a very low standard in barring Henson from testifying as an expert. And she also can't establish that defense counsel was ineffective in failing to certify Dr. Said as an expert or Henson as an expert in other appropriate qualified fields, as defendant argues, where she did not establish and the record fails to show what expert testimony those witnesses would have given, and that either was qualified to give it, and that there's a reasonable probability that the trial's result would have been different had they given it, whatever the testimony might have been. I really would rely on the other arguments in our brief, unless the court has any questions for me. I think that it's clear that the state met its burden, and the defendant cannot establish anything that would have, that would establish any error in what the trial court did or what defense counsel did. Certainly not that defense counsel was ineffective, and to the extent that perhaps defense counsel should have done more. This court cannot, on this record, determine that it was ineffective assistance, but as Your Honor pointed out, Justice Steigman, that that is more suitable for bringing up in a post-conviction petition. So, unless the court has questions, I would simply ask that you affirm. Well, I see none, so thank you, Ms. Shepherd, for your representations, and I'll ask Mr. Wallenstein, do you wish to present any rebuttal argument at this time, sir? Yes, quickly. Go ahead. I would say that there is something in the record which shows that there is another cause. There's evidence in this record that she was drowsy at the time of driving. The question is, why was she drowsy? What was the cause? The way the trial played out and the fact that she wasn't allowed to present any expert testimony means that the sole evidence for making any inference was the state's evidence. Well, doesn't the record contain various statements from her and other parties concerning, other witnesses concerning where she had been, what she had been doing, why she was driving, as she was? Yes, and as I said, I think that's the part of the record that supports there could have been an alternate cause for the accident. The problem is that— I'm sorry, excuse me. Yes. I didn't quite understand what you said. That part of the record could have what? Yeah, I think that part of the record supports what I'm saying, which is that it could support an alternate cause to the accident. The problem is that without an expert to sort of tie these knots together, all that's left is the state's experts who kind of weave together a story that these drugs can cause impairment, make somebody drowsy, and there's no alternate inferences to be made beyond really the state's case. So she does present stuff that she's tired and all that, but the problem is that she has no expert to come in, back it up, make it a complete argument, and sort of give the court an alternate basis for ruling not guilty. I'll also say that what the state has to prove in this case is that the influence of the drugs have to be to the degree that she was rendered incapable of driving. What was the alternate theory that the expert would have offered in terms of the reason for her drowsiness? Well, I think that Dr. Syed could have come in as her treating physician and talked about her usage of these drugs for a sustained period of time and how they may have affected her physical ability to drive. And Dr. Hudson could have said, okay, drowsiness is an alternate explanation based on her physical manifestations. At the time of the accident, everything was happening. Drugs is not necessarily the only cause, and drowsiness alone, just her being tired, could have been the cause of the accident. So she was not going to contest that she had consumed the drugs? Yeah. But simply say, I'm not tired from consumption of the drugs, I'm tired from something else? Well, there had been evidence that she hadn't been sleeping for a number of days, and that came in through her statement, came in through her husband. She had just been tired around that time. It had been a very long day for her. She had been driving far out for her. And she consumed drugs right before she came home, right? Right. And I think that that's why a treating physician's testimony was critical, because he could talk about what is the effect of this drug on her, not just generally what happens in some, you know, example person takes these drugs. He could talk about her actual usage of the drugs. And from that sense, it could have been an alternate explanation that because of her long-term use of these drugs and her experience, it would not have necessarily rendered her incapable, that she was tired for some alternate reason. That's the reason the accident happened, and that there was an alternate form of impairment. I also mentioned that the cocaine metabolite, that only appeared in the urine, which can be from weeks before. She admitted she took it two days before. There's no evidence that she had taken any cocaine metabolite on the day of the accident. So that's really more of a red herring than anything else. Unless there are any further questions, I'll just ask your honors to reverse Mrs. Woodring's conviction, remand for a new trial, or alternately, reduce her sentence to remand for resentencing. Well, I thank you, Mr. Wallenstein, and I thank Ms. Shepard. I'm sorry we had the difficulty we did in having Ms. Shepard's appearance. And this time, then, the court will take this matter under advisement, and we will stand in recess.